# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

SHAKIRA CABÁN-LÓPEZ, *et al.*,

Plaintiffs,

v.

HON. CHRISTIAN E. CORTÉS-FELICIANO, *et al.*,

Defendants.

CIVIL NO. 22-1220 (HRV)

## OPINION AND ORDER

### I.    BACKGROUND

Plaintiffs Shakira Cabán López ("Ms. Cabán-López"), Mariana O. Peláez Sánchez ("Ms. Peláez-Sánchez"), Héctor Hernández Ríos ("Mr. Hernández-Ríos"), Melvin Figueroa Varela ("Mr. Figueroa-Varela"), and Edgardo Ramírez Soto ("Mr. Ramírez-Soto") (collectively, "the Plaintiffs") are all career employees of the Municipality of Aguada who served in trust positions during the administration of New Progressive Party (hereinafter referred to as "NPP") Mayor, Hon. Manuel "Gabina" Santiago-Mendoza (hereinafter, "Mayor Santiago-Mendoza"). Mayor Santiago-Mendoza reinstated them to their career positions at the very end of his administration, effective on the first day of the incoming Popular Democratic Party (hereinafter referred to as "PDP") administration of codefendant, Hon. Christian E. Cortés-Feliciano (hereinafter "Mayor Cortés-Feliciano"). All Plaintiffs identify as NPP supporters.

Plaintiffs argue that they have been subjected to adverse employment actions in retaliation for exercising their First Amendment right to associate with and speak in support of the NPP and its candidates for political office. Specifically, they claim that their salaries were reduced and that they have suffered workplace harassment that included change in responsibilities, losing access to digital platforms that enabled them to do their jobs, and losing privileges. Plaintiffs filed suit under 42 U.S.C. § 1983 against Mayor Cortés-Feliciano; Mr. Delvis Datiz Ruiz, Director of Human Resources of Aguada; Marisol Rosa, City Administrator; Cadmiel López, Director of Finance; Zulma Rivera, Director of the Office of Federal Programs; Luis Acevedo, Director of Public Works; Kelvin Cortes and Jairo Jimenez, Directors of the Administration of Emergency Management; and the Municipal Government of Aguada (collectively, "the Defendants). All individual defendants were sued in their personal and official capacities.

Pending before the Court is Defendants' motion for summary judgment, (Docket No. 60), which Plaintiffs opposed. (Docket No. 74).

## II.   FINDINGS OF FACT

The parties stipulated several facts, which are included in the Joint Stipulation for Trial. (Docket No. 59). Having examined the Parties' pleadings and/or Statements of Uncontested Material Facts ("SUMF") and oppositions thereto in the light most favorable to the non-moving party, I find that the following facts are uncontested:

1.   All plaintiffs had been appointed to career positions before the NPP administration of Mayor Santiago-Mendoza appointed them to trust positions. (Joint Stipulation for Trial, Docket No. 59, ¶1).

2.   Mayor Santiago-Mendoza lost his primary election in the summer of 2020. (Exhibit 5 to Docket No. 60, Excerpts of Shakira Cabán-López' deposition transcript, p. 12, lines 4-12, Docket No. 60-6).

3. Before Mayor Cortés-Feliciano was set to take office, all plaintiffs received a reinstatement letter from Mayor Santiago-Mendoza on December 18, 2020, effective January 11, 2021. The letters were identical to the one sent to plaintiff Shakira Cabán-López on December 18, 2020, with the only variation being the Plaintiff's name, the position to which they are being reinstated, the salary scale assigned to the position and the monthly salary upon reinstatement. (Docket No. 59, ¶1).

4. The reinstatement letters do not reference the employees' performance while serving as trust employees. (Exhibit 1 to Docket No. 60, Shakira Cabán-López' Reinstatement Letter, Docket No. 60-2, Translation at Docket No. 71-1).

5. The reinstatement letters mention Plaintiffs' new salaries pursuant to salary scales for Plaintiffs' respective career positions. (Id.).

6. These salary scales derive from a document signed by Mayor Santiago-Mendoza on October 16, 2020. (Docket No. 59, ¶4).

7. The October 16, 2020, document, titled "Executive Branch Compensation Plan for the Career Service," reflects amendments made to the Classification and Compensation Plan enacted by the Municipality of Aguada through Ordinance Number 34, Series 2007-2008 of February 18, 2008. (Exhibit 8 to Docket No. 60, Docket No. 60-9, Translation at Docket No. 71-6).

8. The 2008 Compensation Plan established 16 pay scales with minimum and maximum monthly compensations for career employees. The October 16, 2020, document purports to establish a different system with 17 pay scales (adding one numbered 213.1) with higher maximum salaries for each pay scale, when compared to the one in Ordinance 34. (Exhibit 4 to Docket No. 60, p. 4, ¶1; p. 5, ¶3, Docket No. 60-5, Translation at Docket No. 71-4).

9. Pursuant to the October 2020 document, "[t]he Mayor may supplant the totality of the compensation structure, in which case he shall have all of the studies and recommendations of the Director of Human Resources and the prior approval of the Municipal Legislature." (Docket No. 60-9, p. 22, part "D", second paragraph).

10. The addendum to the October 2020 document, titled "Fifth Assignment of the Classes of Positions to the Compensation Levels of the Salary Structure of the Executive Branch of the Career Service" includes lists for the compensation of career positions, preceded by a statement to the effect that: Through the foregoing the classes of positions included in the Classification Plan of the Career Service of the Executive Branch of the Municipal Government of Aguada are assigned to the corresponding salary levels of the Compensation Plan, to take effect on October 16, 2020. (Docket No. 60-9, p. 34-37).

11. The October 2020 modifications were not approved by the Aguada Municipal Legislature. (Docket No. 59, ¶5).

12. In the case of Ms. Cabán-López, her last gross monthly salary in her career position as Human Resources Analyst was $1,545.00, her gross monthly salary in the trust position as Human Resources Director was $3,000.00, and she was reinstated to the position of Human Resources Analyst with a gross monthly salary of $2,900.00. (Exhibit 2 to Docket No. 60, May 14, 2021 letter sent to Ms. Cabán-López, p.1, Docket No. 60-3, Translation at Docket No. 71-2).

13. Plaintiff Mariana Peláez-Sánchez was reinstated to the career position of Accounting Analyst with a gross monthly salary that was $5.00 less than what she was paid when she oversaw the entire Finance Department. (Docket Number 59, ¶ 20).

14. Plaintiff Edgardo Ramírez-Soto was reinstated to the career position of Municipal Tax Inspector with a gross monthly salary that was $5.00 less than what he was paid when he was the Municipal Clerk. (Id.).

15. Plaintiff Héctor M. Hernández-Ríos was reinstated to the career position of Emergency Management Officer with a gross monthly salary that was only $10.00 less than what he was paid when he oversaw the entire Emergency Management Department. (Id.).

16. Plaintiff Melvin Figueroa-Varela was reinstated to the career position of School and Passenger Transport Driver with a gross monthly salary that was only $105.00 less than what he was paid when he was the in charge of the entire Environmental Control Department. (Id.).

17. By letter dated March 31, 2021, Mayor Cortés-Feliciano transferred plaintiff Peláez-Sánchez to the Federal Programs Department, effective April 5, 2021 and advised her of her right to appeal that action to the Puerto Rico Appellate Commission for Public Service, if she disagreed with the nominating authority's determination. (Exhibit 9 to Docket No. 60, March 31, 2021 transfer letter, Docket No. 60-10, Translation at Docket No. 71-7).

18. After Mayor Cortés-Feliciano came into office, External Human Resources Consultants Guerra, Chiesa & Rivera, Inc., (the "Consultants"), sent him a report dated April 24, 2021 (hereinafter the "Report"). The Report stated the Consultants' findings and recommendations regarding the prior administration's reinstatement of the former trust employes (including plaintiffs and other co-workers) and recommended corrective action. (Exhibit

4

6 to Docket No. 60, April 4, 2024, Consultant's Report, Docket No. 60-7, Translation at Docket No. 71-5).

19. The Report was signed by Ms. by Luz C. Guerra-Nieves (hereinafter, "Ms. Guerra"). (Id.).

20. The Report included itemized recommendations for the salary adjustment of all reinstated employees to the maximum amount approved under the pay scales. (Id., p. 6-18).

21. Ms. Cabán-López knows Ms. Guerra as an external contractor for the Municipality of Aguada. (Docket No. 60-6, p. 14, lines 1-25; p. 15, lines, 1-25).

22. Plaintiff Cabán-López does not have reason to believe that Ms. Guerra bears any ill will against her, whether for political or any other reasons. (Id., p. 16, lines 23-25; p. 17, lines 1-8).

23. Plaintiff Melvin Figueroa-Varela does not personally know whether Ms. Guerra was aware of his political affiliation, nor does he know hers. (Exhibit 7 to Docket No. 60, Excerpts of plaintiff Melvin Figueroa-Varela's deposition testimony, p. 10, lines 1-12, Docket No. 60-8).

24. On May 14, 2021, Mayor Cortés-Feliciano sent a letter to all Plaintiffs advising them that, as per the recommendations received from the Consultants, he intended to adjust their monthly salaries upon reinstatement. The letter also states that Plaintiffs had the right to be heard before an examining officer prior to the decision becoming final. (Docket No. 59, ¶7; Docket No. 60-3).

25. The letter received by Ms. Cabán-López is identical to that received by the other plaintiffs except for the name, positions (before and after reinstatement) and salary history. (Docket No. 59, ¶8).

26. All Plaintiffs exercised their right to a predetermination hearing before examining officer Guillermo Garau-Díaz, Esq., who consolidated all cases, as all employees were represented by the same attorney. (Id., ¶10).

27. Seven of the affected employees submitted their position in writing. One of the arguments they advanced was that the document signed by former Mayor Santiago- Mendoza on October 16, 2020, did not need the approval of the Municipal Legislature. (Id., ¶11).

28. The June 3, 2021, position letter sent by Ms. Cabán-López is identical to the one sent by the other plaintiffs except for facts and information specific to each plaintiff's case. (Id., ¶12; Exhibit 3 to Docket No. 60, Position Statement

5

argued by plaintiff Shakira Cabán-López, Docket No. 60-4, Translation at Docket No. 71-3).

29. In June 2021, the examining officer issued a recommendation as to each Plaintiff, advising Mayor Cortés-Feliciano to correct their salaries. He also recommended the recovery of the difference between the adjusted salary prior to the adjustment and referring the matter to the Puerto Rico Government Ethics Office to determine whether there had been any violations of the Puerto Rico Ethics Code. (Docket No. 59, ¶ 14; Docket No. 60-5).

30. In July 2021, Mayor Cortés-Feliciano sent a letter to the Plaintiffs informing them that he was following the examining officer's recommendation and advising them of their right to file an administrative appeal before the Puerto Rico Appellate Commission for Public Service. (Docket No. 59, ¶ 17).

31. As per the determination, this is the breakdown of the resulting positions and salaries, as stipulated by the Parties:

| Plaintiff | Trust Position Held Until January 2021/Gross Monthly Salary | Career Position After Reinstatement/Gross Monthly Salary Assigned Upon Reinstatement | Monthly Gross After Adjustment/ Salary Difference |
|---|---|---|---|
| Shakira Cabán López | Human Resources Director/$3,000.00 | Human Resources Analyst/$2,900.00 | $2,313.00 per month $587.00 less |
| Edgardo Ramírez Soto | Municipal Clerk/$2,700.00 | Municipal Tax Inspector/$2,695.00 | $2,105.00 per month $590.00 less |
| Melvin Figueroa Varela | Director of Environmental Control/$2,100.00 | School and Passenger Transport Driver/$1,995.00 | $1,726.00 per month $269.00 less |
| Hector M. Hernández Ríos | Director of Emergency and Disaster Management/$2,660.00 | Emergency Management Officer/$2,650.00 | $2,105.00 per month $545.00 less |
| Mariana O. Pelaez Sánchez | Director of Finance/$3,200.00 | Accounting Analyst/$3,195.00 | $2,541.00 per month $654.00 less |

(Docket Number 59, ¶ 20).

32. Plaintiffs were not the only reinstated employees as to whom recommendations were made, as the list also included: 1) former Director of Sports and Recreation, Gabriel Arredondo-Rios; 2) former Special Aide to the Mayor, Ismayra Guzmán Lorenzo; 3) former Executive Aide to the Mayor, Evy D. Galloza-Vázquez (whose recommended adjustment was the largest, at $843.00 per month); 4) former Tourism Director, Euclides Feliciano-Méndez; 5) former Executive Aide to the Mayor, Brendaliz Caro-Ugarte; 6) former Director of Public Works, Carlos Orama-Matos; and 7) former Internal Auditor Orlando Ortiz Cabán.[1]

33. On December 21, 2021, Ms. Cabán-López was approached by codefendant Marisol Rosa, when the former was using the photocopier of the Finance Department, which was not her department. (Docket No. 60-6, p. 44, lines 1-12).

34. Ms. Cabán-López does not know if the photocopier in her department was working on December 21, 2021, nor did she check. (Id., p. 44, lines 13-22).

35. On that date, Ms. Cabán-López was making copies of the transition committee report. (Id., p. 45, lines 2-8).

36. According to Ms. Cabán-López, Ms. Rosa's exact words on that day were "[t]hat it was strange to her that I was utilizing that photocopy because at the moment that my Rock Solid access was taken from me, they should have taken all of my access as a director because of being part of the NPP party by instructions of the mayor." (Id., p. 45, lines 20-25; p. 46, lines 1-8).

37. According to Mr. Figueroa-Varela, Municipality of Aguada official Jason Hernández told him that "they're cleaning house", which referred to NPP employees. (Exhibit 10 to Docket No. 60, p. 45, lines 12-14, Docket No. 60-11).

38. Figueroa-Varela also testified at his deposition that co-defendant Luis Acevedo told him "We don't have any accommodations here for the NPP'ers." (Id., p. 45, lines 15-23).

39. After the conversation with Mr. Luis Acevedo, Mr. Figueroa-Varela was transferred to work at the elderly center. (Id.).

---

[1] Although Defendants did not properly support this SUMF, in their opposing statement of uncontested material facts ("OSUMF"), Plaintiffs admitted it. (Docket No. 75, OSUMF No. 25).

### III.    APPLICABLE LAW AND DISCUSSION

The Defendants raise three main contentions in their motion for summary Judgment.  They argue, first, that the decision to adjust Plaintiffs salaries upon reinstatement to their career positions was made for legitimate and nondiscriminatory reasons. This is known as the *Mt. Healthy*[2] defense. Second, the Defendants posit that Plaintiffs' short-of-dismissal inferior working conditions claims are time barred.  Lastly, Defendants assert that Mayor Cortés-Feliciano is entitled to qualified immunity.

Plaintiffs oppose affirming that there are genuine issues of material fact that preclude summary judgment. They generally maintain that the Consultant's audit to the former mayor's personnel actions was a subterfuge for political discrimination; that the continuing violation doctrine applies to make their workplace harassment claims timely; and that contested issues of fact preclude a finding for the mayor with respect to the qualified immunity defense.

I address the parties' specific contentions in detail below. But first, I outline the legal framework that needs to guide my analysis.

### A.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In

---

[2] *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L.Ed.2d 471 (1977).

deciding whether summary judgment is appropriate, the role of the Court is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (*citing Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). The court must view the facts in the light most hospitable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Patterson v. Patterson*, 306 F.3d 1156, 1157 (1st Cir. 2002).

The moving party bears the initial burden of "asserting the absence of a genuine issue of material fact [and to support] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulhill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). The burden then shifts to the opposing party to show that a factual dispute does exist, and that the trier of fact could reasonably find in its favor. *See Santiago-Ramos P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). A party opposing a properly supported motion for summary judgment, "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial. "*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)(*quoting* Fed. R. Civ. P. 56(c)). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Id.* (*quoting Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). "'Neither conclusory allegations [nor] improbable inferences' are sufficient to defeat summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002) (*quoting J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1993)).

**B.    Analysis**

### 1.    *Salary Adjustment Claim*

The First and Fourteenth Amendments protect state government employees from being subjected to discrimination of the basis of their political affiliations. Put differently, under the First Amendment, government officials may not take an adverse employment action against a public employee because of the employee's political affiliation, unless political loyalty is a legitimate requirement for the position in question. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75-76, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990); *Branti v. Finkel*, 445 U.S. 507, 516-518, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 372-73, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976). Section 1983 is the customary vehicle through which relief is sought for political discrimination. *Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 46 (1st Cir. 2019) (discussing sufficiency of allegations of political discrimination under 42 U.S.C. § 1983).

Further, "[u]nder *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), allegations of political discrimination in employment are judged according to a burden-shifting regime. Plaintiffs bear the initial burden to show that 'political discrimination was the substantial or motivating factor in a defendant's employment decision.'" *Vélez-Rivera v. Agosto-Alicea*, 437 F.3d 145, 152 (1st Cir. 2006) (*citing Cepero–Rivera v. Fagundo*, 414 F.3d 124, 132 (1st Cir. 2005)). Once that initial burden is discharged, the burden of proof shifts to defendants, who must then show that "(i) they would have taken the same action in any event; and (ii) they would have taken such action for reasons that are not unconstitutional." *Id.* (citing *Mt. Healthy*, 429 U.S. at 286-87, 97 S. Ct. at 575).

10

For argument's sake, Defendants concede that Plaintiffs' allegations regarding discriminatory animus could possibly generate credibility issues not suitable for summary disposition. [3] With respect to the second step, however, Defendants proclaim a lack of factual controversy regarding their legitimate, nondiscriminatory reasons for adjusting plaintiffs' salaries. Mainly, they contend that the pay raises that resulted from Plaintiffs' reinstatement to their career positions were done in violation of the Municipal Code because the mayor could not unilaterally amend the salary scales without approval from the Municipal Legislature. Plaintiffs counter that P.R. Laws. Ann., tit. 21, § 7237 allows the mayor to reclassify positions and increase salaries even absent approval of the municipal Legislature.[4]

Under Puerto Rico Law, a municipal employee has an absolute right to be reinstated to his or her former career position with all the benefit accrued for that position during the time in which the employee was in the trust service. P.R. Laws. Ann., tit. 21, §7234(a). It is undisputed that all Plaintiffs had been appointed to career positions before Mayor Santiago-Mendoza appointed them to trust positions and later reinstated them back to their career positions effective January 11, 2021. (SUMF, ¶1). The reinstatement letters sent by Mayor Santiago-Mendoza explained that Plaintiffs' new salaries were based on the pay scales for their respective career positions as per

---

[3] Defendants make clear that they are skipping to the second phase of the analysis for efficiency purposes and in no way waive their right to challenge the prima facie proffer at trial. (Docket No. 60, p. 5).

[4] Plaintiffs incorrectly cite P.R. Laws. Ann., tit. 21, §7237, (Docket No. 74, p. 8), when article 2.047(d) article is codified at P.R. Laws. Ann., tit. 21, §7236.

amendments made to the Municipality's Classification and Compensation plan on October 16, 2020. (SUMFs, ¶¶5-6). It is also undisputed that these amendments were not approved by the Aguada Municipal Legislature. (SUMF, ¶11). The net effect of the reinstatement, salary-wise, was nearly identical to what the reinstated career employees had earned as trust employees in managerial positions. (SUMF, ¶31).

Defendants maintain that the Municipal Code requires approval by the Municipal Legislature of any employment reclassification and cite to Article 2.056, P.R. Laws. Ann., tit. 21, § 7245. Article 2.056 provides that municipal compensation plans require the mayor to prepare such plans for positions within the executive branch of the Municipal Government in the career and trust service. These plans "must be aligned with the prevailing fiscal situation in the municipality and will require approval by the City Council in an ordinance." (Docket No. 65-2). As Defendants further point out, the statutory language of Article 2.056 complements that of Article 1.039(j) of the Municipal Code, P.R. Laws. Ann., tit. 21, § 7065(j), which states that the legal duties of municipal legislatures include "[a]pproving the plans for the human resources area of the municipality, regulations, guidelines, classification and pay grades to be adopted for the administration of the human resources system as the mayor may submit in accordance with this Code." (Docket No. 65-1).

Plaintiffs do not refute that the Municipal Legislature did not approve the October 2020 Plan. (SUMF, ¶11). As stated, in their view, such approval was unnecessary because Article 2.047(d) of the Municipal Code gave Mayor Santiago-Mendoza carte blanche. The cited provision states:

d. Maintenance of the Classification Plan.- It shall be the responsibility of the Mayor or of the President of the Municipal Legislature to create, eliminate, consolidate, and modify the classes of positions included in the classification plan of their respective jurisdictions in order to keep it current, to reassign any class of position from one pay scale to another contained in the compensation plan, as well as to reclassify positions and order changes in duties, authority and responsibility as provided by regulation.

P.R. Laws. Ann., tit. 21, §7236. (Docket No. 74-1).

Plaintiffs, however, cite only to a subsection of the full statute and obviate the preamble and general language providing that the mayor will establish any classification plan for employment positions and salaries **"with the approval of the Municipal Legislature."** P.R. Laws. Ann., tit. 21, §7236 (translation and emphasis ours). The statutory structure clearly suggests, and I find, that subsection (d) does not operate as a standalone provision, but it is tied to the overarching premise of the article—that the actions described above require legislative approval. The legislative intervention requirement is a common denominator, being present in Article 2.047 as well as in the aforementioned articles 2.056 and 1.039(j). The text of the law is clear, as is the legislative mandate. My interpretation does not need to go further. *See Hosp. San Antonio, Inc. v. Oquendo-Lorenzo*, 47 F.4th 1, 7 (1st Cir. 2022) (citing *In re Plaza Resort at Palmas, Inc.*, 741 F.3d 269, 274 (1st Cir. 2014)) ("Our interpretation of Puerto Rico statutes 'begins with the text of the underlying statute, and ends there as well if the text is unambiguous.'"); *see also* P.R. Laws. Ann., tit. 21, §14 ("When a law is clear and free from all ambiguity, the letter of the same shall not be disregarded, under the pretext of fulfilling the spirit thereof.").

Moreover, according to Defendants, the salary increases also violated article 2.056(m) of the Municipal Code, which mandates that raises for reclassified employees are contingent on the employee's excellent performance as evidenced by an evaluation sheet in the file. In that respect, the Code states:

> The trust employees with a right to reinstatement to career positions as per this Code, at the time of their reinstatement shall be entitled to all the benefits that, in terms of classification and salary, may have accrued in the career position during the time served in the trust service. The employee shall also have the right to the increases granted via legislation and to an increase of up to ten percent (10%) of the salary received as a trust employee. For this raise to be granted it shall be necessary that the employee's excellent performance be evidenced by an evaluation sheet in the file. On the other hand, if the reinstated employee served in the trust service for a period of no less than three (3) years, the nominating authority will be allowed to authorize any increase as to the difference between salary received in the career service before going to the trust service and what would be paid upon reinstatement to the career position. In order to grant this recognition, it shall also be necessary to provide evidence of the employee's excellent performance. (translation provided; emphasis added).

P.R. Laws. Ann., tit. 21, § 7245(m). (Certified translation, Docket No. 65-2).

It is undisputed that the reinstatement letters do not reference the employees' performance while serving as trust employees. (SUMF, ¶4). In fact, nothing in the record indicates that Plaintiffs' personnel files contain an evaluation form evidencing their excellent performance. Plaintiffs aver that their performance is not at issue in this case. But that is not the point. The issue here is that salary increases to reinstated employees is not unconditional (or discretional) as Plaintiffs purport. The law requires "evidence of excellence performance" and, undisputedly, that evidence is absent from the record.

14

Thus, not only did the reinstatement letters premise the employees' salary increases on a reclassification plan that was not approved according to legal requirements, but it conferred those raises without highlighting the employees' excellent performance and evidencing it on the record. Therefore, in resisting Defendants' motion for summary judgment, Plaintiffs did not put forth sufficient facts to refute that the salary increases were done in violation of the Municipal Code.

Those irregularities raised red flags with the incoming municipal administration led by Mayor Cortés-Feliciano and the Consultants hired to assist during the transition period. The Consultants rendered a full report recommending a salary adjustment for several employees. The recommendation included not only Plaintiffs but other employees as well. (SUMF, ¶18). Mayor Cortés-Feliciano adopted the recommendations and, on May 14, 2021, sent a letter to all Plaintiffs advising them that, relying on the Report, he intended to adjust their monthly salaries upon reinstatement and advising them of their right to be heard before an examining officer. (SUMF, ¶24).

All Plaintiffs exercised their right to a predetermination hearing before examining officer Guillermo Garau-Díaz, Esq. (SUMF, ¶26). On June 2021, the examining officer issued a report as to each Plaintiff, making the following recommendations: (1) that the Mayor move forward with the proposed action; (2) that he pursue legal action to collect the difference between the adjusted salary prior to the adjustment and; (3) that the matter be referred to the Puerto Rico Government Ethics Office to determine whether or not there had been any violations of the Puerto Rico Ethics Code. (SUMF, ¶29). In July 2021, Mayor Cortés-Feliciano sent a letter to the plaintiffs informing them that he was following the examining officer's recommendation and advising them of their right to file

an administrative appeal before the Puerto Rico Appellate Commission for Public Service. (SUMF, ¶30).

According to Defendants, the tract of the mayor's actions shows that he justifiably reclassified Plaintiffs' salaries according to the 2008 scale. I agree. Mayor Cortés-Feliciano correctly determined that his predecessor acted ultra vires in awarding salary increases to Plaintiffs. His final determination came after relying on the Consultant's Report and the findings of an independent examining officer. Neither the Consultant's recommendation nor the examining officer's have been shown to biased or a subterfuge for political discrimination. As such, as it pertains to the salary adjustments, I find that Plaintiffs have not sufficiently controverted that the Mayor would have taken the same action, politics notwithstanding. Summary judgment is thus GRANTED in Defendants' favor as to the salary adjustment claim.

### 2. *Workplace Harassment Claims*

Next, Defendants argue that Plaintiffs' remaining workplace harassment claims are time-barred. The claims are premised on Plaintiffs' alleged ostracizing, disparate treatment and harassment after the new administration came into power.

Again, "[s]ection 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place under color of any statute, ordinance, regulation, custom, or usage, of any State." *Diaz-Zayas v. Municipality of Guaynabo*, 600 F. Supp. 3d 184, 194 (D.P.R. 2022) (citing *Klunder v. Brown Univ.*, 778 F.3d 24, 30 (1st Cir. 2015)). Because § 1983 does not establish a limitations period, the United States Supreme Court has instructed that courts should borrow the prescriptive term for personal injury actions from their forum state. *Centro*

*Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005) (*citing Owens v. Okure*, 488 U.S. 235, 240–41, 249–50, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989) and *Nieves v. McSweeney*, 241 F.3d 46, 51 (1st Cir. 2001)). In Puerto Rico, the limitations period for personal injuries is one year. *See* Article 1204(a) of the 2020 Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 9496(a) (formerly Article 1868(2) of the 1930 Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5298(2)). Under Puerto Rico law, the one-year limitations period begins to run one day after the date of accrual. *See Centro Médico del Turabo*, 406 F.3d at 6 (*citing Carreras–Rosa v. Alves–Cruz*, 127 F.3d 172, 175 (1st Cir.1997)). The date of accrual is determined based on federal law. *Id.* A 1983 action generally accrues "when the plaintiff knows, or has reason to know, of the injury on which the action is based." *Id.*

Defendants proffer that Plaintiffs contradict themselves with their recounting of the facts. Plaintiffs place the genesis of the harassment pattern when Mayor Cortés-Feliciano allegedly stated on a radio show "that there were some municipal employees loyal to the New Progressive Party that made illegal procedures when they were reinstated to their career position and they plundered the Municipality of Aguada, specifically he referred to plaintiffs." (Docket No. 60, p. 18, citing Docket 1, ¶ 37). After the radio show, Plaintiffs "duties and responsibilities" were allegedly "reduced, changed or altered." (Docket No. 1, ¶ 38).

There is a factual dispute regarding the exact date of the radio interview. According to Defendants, during discovery, Ms. Cabán-López placed it happening at the beginning of January 2021, while Mayor Cortés-Feliciano testified that he did publicly discuss the human resources findings on a public broadcast, but that this occurred in

mid-December 2020, during the transition period before he took office. (Docket No. 60, p. 18, n. 13). Defendants, however, do not provide record citations for either statement.

The complaint also pinpoints the commencement of the workplace harassment to sometime after Plaintiffs' salary reduction. "Once plaintiffs [sic] salaries were reduced, on July 6, 2021 plaintiffs began to be the victims of political harassment and workplace harassment by defendants and other municipal government employees with the express or tacit consent of said defendants." (Docket Number 1, ¶ 39).

One challenge in assessing the accrual date is that the record is scant on specific dates of the alleged workplace harassment incidents. According to Defendants, Plaintiffs aver that they were supposedly subjected to unreasonably inferior employment conditions since they were reinstated to their former career positions, which Defendants place at some point in January 2021, when the new administration took over. This is a discrete act, Defendants say, for purposes of starting the statute of limitations clock. Let us examine the uncontested facts.

### a. Shakira Cabán-López

In the complaint, it is stated that Ms. Cabán López had her access to the Rock Solid platform canceled and her responsibilities reassigned to Mrs. Maribel Ortiz who is affiliated to the PPD. (Docket No. 1, ¶43). However, no dates were provided.

The Court has only been presented with one dated incident involving Ms. Cabán-López, which occurred on or around December 21, 2021. Her deposition testimony describes an interaction where Ms. Rosa told Ms. Cabán-López that she should have her access to the Rock Solid platform removed under instructions from the Mayor because she was a member of the NPP party. (Docket No. 60-6, p. 45, lines 14-25).

### b. Melvin Figueroa

As per the complaint, Mr. Figueroa was transferred to the Public Works Division under defendant Luis A. Acevedo. (Docket No. 1, ¶100). He was ordered to drive grave trucks, which caused him "great stress." (Id.) That stress, together with the "workplace and political harassment" led to him having a heart attack on September 17, 2021. (Id.).

Mr. Figueroa testified at deposition that both Jason Hernández and Luis Acevedo made comments regarding the removal of NPP party affiliates from employment but the record submitted does not contain the dates for these encounters or indication of the general timeframe in which they occurred. (Docket No. 60-11, p. 45, lines 10-25).

### c. Mariana Peláez-Sánchez

The complaint alleges that Ms. Peláez-Sánchez was substituted as Director of the Finance Department for the Municipality of Aguada after the NPP lost the elections. (Docket No. 1, ¶59). She held that role from January 2017 to January 2021. (Id., ¶58). The incoming Director of Finance was an active member of the PPD. (Docket No. 1, ¶59).

To be able to perform her duties in her new position as pre-interventionist, Ms. Peláez-Sánchez needed access to the Rock Solid platform. (Docket No. 1, ¶61). Her access to the platform was allegedly cancelled, thus limiting her capacity to perform her responsibilities. (Id.). There is no indication on the record of the date in which Ms. Peláez-Sánchez' access to the platform was cancelled.

The complaint goes on to state that Ms. Peláez-Sánchez complained to the Director of Finance, Cadmiel López about the access cancellation. Defendant López told her that he would be evaluating her complaint and assign her new responsibilities, which did not occur. (Id., ¶62). The record does not show the date of the alleged complaint.

It is undisputed that by letter dated March 31, 2021, Mayor Cortés-Feliciano transferred Ms. Peláez-Sánchez to the Federal Programs Department, effective April 5, 2021 and advised her of her right to appeal that action to the Puerto Rico Appellate Commission for Public Service, if she disagreed with the nominating authority's determination. (SUMF, ¶17). According to the complaint, after her transfer to the Federal Programs Department, Ms. Peláez-Sánchez was "practically doing nothing" and once again complained to the Director of Human Resources, codefendant Delvis Datiz Ruiz. (Docket No. 1, ¶66).

The complaint mentions another incident in which defendant Zulma Rivera told Ms. Peláez-Sánchez that all she wanted was that the former mayor and his Administrative Cabinet go to jail. (Id., ¶68). Again, this interaction has no specific date.

### d. Héctor Hernández-Ríos

The complaint only makes general allegations regarding Mr. Hernández-Ríos. Upon inspection of the record and the parties' SUMFs, there are no uncontested facts regarding date-specific workplace harassment incidents.

### e. Edgardo Ramírez-Soto

According to the complaint, Mr. Ramírez-Soto was reinstated in his previous career position of Inspector of Municipal Revenue. (Docket No. 1, ¶110). Furthermore, he "was given almost no responsibilities from January 2021 until November 2021" spending every day "practically doing nothing". (Id., ¶111). This situation led Mr. Ramírez-Soto to complain to codefendant Cadmiel López who told him that "he was following instructions from the mayor, defendant Christian E. Cortés Feliciano, and he was going to see what he could do." (Id., ¶112). No corrective actions were taken. (Id.).

20

After analyzing the uncontested facts, I find that there are factual disputes regarding the accrual date of the claims for workplace harassment under § 1983. Defendants argue that the allegations make Plaintiffs' theory of political vengeance implausible because an administration bent on inflicting political injury would not wait seven months to act.[5] But my task at this procedural juncture is not to speculate about Defendants' motive, it is to validate whether undisputed facts support the claims. Given the record, the accrual date is not as cut-and-dry as Defendants spouse.

In the alternative, Plaintiffs argue that even if some of the harassment incidents fall outside the statutory period, the continuing violation doctrine would salvage the cause of action.

The continuing violation doctrine "is often invoked in cases involving a pattern or policy of employment discrimination in which there has been no single act of discrimination sufficient to trigger the running of the limitations period." *Centro Médico Del Turabo, Inc. v. Feliciano De Melecio*, 321 F. Supp. 2d 285, 291 (D.P.R. 2004), *aff'd by*, 406 F.3d 1 (1st Cir. 2005). "In general terms, the doctrine creates an equitable exception to the statute of limitations because it allows recovery for claims filed outside of the statutory period when the unlawful behavior is deemed ongoing." *Id.* A plaintiff claiming that the doctrine is applicable "must allege that a discriminatory act occurred or that a discriminatory policy or practice existed" within the statutory period. *Id.*; *see*

---

[5] Defendants refer to the seven months between the new administration coming into power in January of 2021 and the issuance of the July 2021 letter adopting the recommendation of both the Consultants and the examining officer regarding readjustment of salaries.

*also Muniz-Cabrero v. Ruiz*, 23 F.3d 607, 610 (1st Cir. 1994). The First Circuit has recognized the applicability of the continuing violation doctrine in the § 1983 context. *Navarro-Colon v. Rodriguez-Mulet*, 582 F. Supp. 3d 5, 16 n.9 (D.P.R. 2022) (*citing Ayala-Sepúlveda v. Municipality of San Germán*, 727 F. Supp. 2d 67, 72 (D.P.R. 2010)).

Plaintiffs claim to have shown uncontested evidence that a continuing campaign of harassment took place, with one marked incident between Mr. Cabán-López's and Ms. Rosa taking place as late as December 21, 2021.

Defendants respond that the title "continued violation" is a misnomer because the doctrine "does *not* allow a plaintiff to avoid filing suit so long as some person continues to violate his rights." *Diaz v. Roman*, 799 F. Supp. 2d 134, 139 (D.P.R. 2011) (*citing Perez–Sánchez v. Public Building Auth.,* 531 F.3d 104, 107 (1st Cir.2008)) (emphasis in original). Instead, the clock is only delayed "until a series of wrongful acts blossoms into an injury on which suit can be brought." *Id.* (*quoting Morales–Tañon v. P.R. Elec. Power Auth.,* 524 F.3d 15, 18 (1st Cir.2008)). Moreover, according to Defendants, courts do not apply the doctrine where, as here, a plaintiff complains of a series of workplace harassment acts but does not allege that those acts had to accumulate over a period of time to constitute a cognizable injury. For support, Defendants rely on *Pérez-Sánchez v. Public Buildings Authority*, 531 F.3d 104, 107 (1st Cir. 2008), *Medero-Díaz v. Román*, 799 F. Supp.2d 134, 139 (D.P.R. 2011) and *Febus-Rodríguez v. Questell-Alvarado*, 660 F. Supp.2d 157, 176-178 (D.P.R. 2009).

In the cited cases, however, there was no dispute as to when the injuries which formed the basis of the claims occurred. [6] Here, in contrast, there are factual controversies regarding the timeline of the alleged harassment incidents. In fact, the Plaintiffs allege a "continuing campaign" of harassment. Thus, I am not in a position to determine whether the continued violation doctrine applies because the dates of the wrongful acts that would run the clock are not clearly established on the record.

The only type of behavior that I can assuredly rule out from the continued violation doctrine analysis is the alleged depravation of duties. District Court decisions have consistently held that stripping an employee of duties "[is] discrete in nature," and thus "not actionable under the continuing violation theory." *Febus-Rodríguez v. Questell-Alvarado*, 660 F. Supp. 2d 157, 177 (D.P.R. 2009) (*citing Díaz–Ortiz v. Díaz–Rivera,* 611 F. Supp. 2d 134, 142 (D.P.R.2009) and *Rivera–Torres v. Ortiz–Vélez,* 306 F. Supp. 2d 76, 82 (D.P.R.2002)). In *Ruiz-Lugo v. Municipality of San Juan*, 382 F. Supp. 3d 173, 175 (D.P.R. 2019), for instance, the Court noted:

> This doctrine, however, does not apply to "discrete" acts that are "instantaneously actionable"—including, as in this case, (i) a failure to assign work to an employee; (ii) a negative performance evaluation; and (iii) a transfer to another work

---

[6] In *Perez-Sanchez*, the First Circuit validated the District Court's finding that plaintiff's § 1983 claims were time-barred because the events surrounding plaintiff's alleged demotion all took place outside the statute of limitations. While they were additional grievances that occurred in later years, "all those were either effects of that initial wrongful conduct, or isolated incidents that did not amount to separate and actionable violations under § 1983." *Pérez-Sánchez*, 531 F.3d at 107. Likewise, in *Diaz*, plaintiffs did not contest that the injuries upon which their claims were premised took place well over a year prior to the filing of the complaint. Because plaintiffs' argument focused instead on the continuity of the alleged proscribed conduct without showing that it had to "accumulate over an extended period of time to form a cognizable constitutional violation," the Court found the doctrine inapplicable. *Diaz*, 799 F. Supp. 2d at 139.

area. Rather, the one-year statute of limitations for these discrete acts (and, by extension, Plaintiff's Section 1983 claims) begins to run upon their initial occurrence, even if Plaintiff continues to feel the effect of such adverse employment actions for as long as he remains employed with the [Municipality of San Juan].

For these reasons, summary judgment is denied regarding the timeliness of the workplace harassment cause of action. However, Plaintiffs may not use any allegation of deprivation of duties or other discreet acts to anchor their claims. The statute of limitations issue will most likely be revisited at trial depending on how the evidence develops. For now, suffice it to say that Defendants have failed to clearly establish the complete absence of a trial-worthy question.

### 3. *Qualified Immunity*

Because I already found that summary judgment is warranted as to the salary reductions claim, I need not decide if the Mayor is entitled to qualified immunity as to such variant of the Plaintiffs' cause of action. My discussion will only address, briefly, the short-of-dismissal workplace harassment and reduction of duties. I note that the Mayor did not focus his qualified immunity argument on these claims.

It is a long-standing rule that government officers sued under § 1983 may avoid liability under the defense of qualified immunity so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known". *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); *see also Justiniano v. Walker*, 986 F.3d 11, 26 (1st Cir. 2021) ("Qualified immunity protects . . . [public officials] . . . from suit when a reasonable decision [made

24

in the course of their duties] . . . ends up being a bad guess -- in other words, it shields from liability 'all but the plainly incompetent or those who knowingly violate the law.'").

The First Circuit has developed a three-prong test in determining if a state actor is entitled to qualified immunity: "(i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004) (*citing Savard v. Rhode Island*, 338 F.3d 23, 28 (1st Cir. 2003)).

Plaintiffs posit that factual disputes remain regarding discriminatory animus and harassment based on it. And as discussed in the previous section, they have put forth some evidence of several incidents that would suggest that they were treated differently due to their political affiliation, which Defendants have not sufficiently refuted. *See Alston v. Town of Brookline*, 997 F.3d 23, 51 (1st Cir. 2021) ("Because qualified immunity is an affirmative defense to liability, the burden is on the defendants to prove the existence of circumstances sufficient to bring the defense into play.").

Here, the Mayor simply has not presented uncontested evidence that his conduct did not violate the clearly established constitutional right to be free from workplace harassment and reduction or elimination of duties on account of political persuasions. A jury may find, if their version is believed, that Plaintiffs were sidelined and their duties eliminated or detrimentally reduced at the behest of the Mayor, or upon his instructions, due to their NPP affiliation. No reasonable official could mistake such conduct as non-violative of the First Amendment. Therefore, the request for summary judgment on the

basis of qualified immunity is DENIED without prejudice of revisiting the question if, as a matter of law, the evidence presented at trial (or lack thereof) establishes entitlement to qualify immunity on the claims that survived dismissal. *See Guillermard-Ginorio v. Contreras-Gomez*, 585 F.3d 508 (1st Cir. 2009) (addressing on appeal the propriety of qualified immunity ruling in post-trial motions).

### IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Docket No. 60) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**

In San Juan, Puerto Rico this 30th day of September, 2025.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE
